**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF OHIO**
**EASTERN DIVISION**

| | | |
|---|---|---|
| **TRINA E. SARLI,** | ) | **CASE NO. 1:13CV2600** |
| | ) | |
| **Plaintiff,** | ) | **MAGISTRATE JUDGE** |
| | ) | **GEORGE J. LIMBERT** |
| **v.** | ) | |
| | ) | |
| **CAROLYN W. COLVIN[1],** | ) | **MEMORANDUM OPINION & ORDER** |
| **ACTING COMMISSIONER OF** | ) | |
| **SOCIAL SECURITY,** | ) | |
| | ) | |
| **Defendant.** | ) | |

Trina E. Sarli ("Plaintiff") seeks judicial review of the final decision of Carolyn W. Covlin ("Defendant"), Acting Commissioner of the Social Security Administration ("SSA"), denying her applications for Disability Insurance Benefits ("DIB") and Supplemental Security Income ("SSI"). ECF Dkt. #1.  For the following reasons, the Court AFFIRMS the Commissioner's decision and dismisses Plaintiff's complaint in its entirety with prejudice:

**I.**     **PROCEDURAL AND FACTUAL HISTORY**

On August 25, 2009, Plaintiff filed applications for DIB and SSI alleging disability beginning May 5, 2006 due to depression, bipolar disorder, anxiety, knee arthritis and endometriosis.  ECF Dkt. #12 ("Tr.") at 218-227, 246.  Plaintiff's applications were denied initially and on reconsideration. Tr. at 85-104. Plaintiff filed a request for hearing before an Administrative Law Judge ("ALJ") and on March 21, 2012, an ALJ conducted an administrative hearing where Plaintiff was represented by counsel. Tr. at 34, 109.

At the hearing, the ALJ heard testimony from Plaintiff and a vocational expert ("VE").  Tr. at 34-80.  On June 20, 2012, the ALJ issued a Notice of Decision – Unfavorable.  *Id*. at 11-25. Plaintiff filed a request for review of the ALJ's decision and on September 25, 2013, the Appeals Council issued an order denying the request for review.  *Id*. at 1-6.

_____

[1] On February 14, 2013, Carolyn W. Colvin became the acting Commissioner of Social Security, replacing Michael J. Astrue.

On November 22, 2013, Plaintiff filed the instant lawsuit seeking review of the Commissioner's decision.  ECF Dkt. #1.  On March 24, 2014, the parties consented to the jurisdiction of the undersigned.  ECF Dkt. #14.  On May 21, 2014, Plaintiff filed a brief on the merits.  ECF Dkt. #16.  On June 20, 2014, Defendant filed a brief on the merits.  ECF Dkt. #17.  On June 30, 2014, Plaintiff filed a reply.  ECF Dkt #18.

## II.    RELEVANT MEDICAL HISTORY

On February 11, 2007, Plaintiff presented to the emergency room complaining of severe anxiety and feeling like she was "crawling out of her skin."  Tr. at 427, 429.  It was determined that Plaintiff was not a candidate for admission  and she decided to leave the hospital after the evaluation.  *Id*. at 430.

On May 3, 2007, Plaintiff presented to Nurse Practitioner Katherine Proehl at Neighboring Mental Health ("Neighboring") for treatment.  Tr. at 414.  Ms. Proehl noted that Plaintiff had treated with her before at another treatment center and Plaintiff reported feeling fairly stable on Zoloft and Klonopin with a little anxiety and some compulsive traits, but she had a hysterectomy in June 2006 and started abusing pain pills.  *Id*.  Plaintiff explained that she had been on a variety of medications at the prior treatment center, but her anxiety skyrocketed and she suffered a panic attack two months ago that caused her to go to the emergency room.  *Id*.  Plaintiff decided that she wanted to stop abusing medications and start feeling better.  *Id*.  She stated that she and her daughter were living with her parents and her parents now locked up all of her narcotic medications.  *Id*.  She was taking Zoloft, Klonopin, which she was taking more than prescribed and had run out of, Premarin, and Vicoden, which her parents had to lock up so that she would not use it all.  *Id.*  She also indicated that she was abusing Percocet and crushing and snorting Oxycontin, although she had not done so in the last week.  *Id.*  She obsessed over safety and checked the outlets three to four times per day.  *Id*.  She struggled to sleep, drank five cups of coffee in the morning, and smoked half a pack of cigarettes per day.  *Id*.

Nurse Proehl reviewed Plaintiff's psychiatric history, in which Plaintiff reported that she had an eating disorder as an adolescent and was sent to a program to help her with the disorder at age seventeen.  Tr. at 414.  Plaintiff indicated that after that, she began abusing alcohol and stopped

drinking alcohol when she became pregnant, but her anxiety increased and she sought treatment at Pathways with Ms. Proehl, who successfully treated her with Zoloft.  *Id*. Plaintiff denied self-harm or suicidal attempts and she continued to see a counselor at the prior treatment center.  *Id.*

Upon examination, Ms. Proehl noted that Plaintiff was a bit jumpy and nervous, with avoidant eye contact, coherent, relevant and slightly pressured speech, no delusions or hallucinations, and no suicidal or homicidal thoughts.  Tr. at 415.  She found Plaintiff's thought process logical, her mood anxious with dips in depression and a bit irritable, constricted affect, and a bit agitated and restless.  *Id.*  Nurse Proehl noted that Plaintiff was medication-seeking.  *Id.*  She found Plaintiff's memory, attention and concentration, and judgment and insight to be fair, and her intellectual ability was estimated to be average.  *Id.*

Ms. Proehl diagnosed Plaintiff with panic disorder, provisional, obsessive/compulsive traits, and opiate dependency in two-day remission.  Tr. at 415-416.  She rated Plaintiff's global assessment of functioning at 52, which indicated moderate symptoms.  *Id.*  She recommended that Plaintiff continue her counseling and she increased Plaintiff's Zoloft, although Plaintiff was pushing her for more Klonopin, which she felt was not a good idea.  *Id*. at 416.  She also prescribed Neurontin for Plaintiff's anxiety and recommended that Plaintiff decrease her caffeine intake and eat healthier.  *Id*.

On May 16, 2007, Ms. Proehl diagnosed Plaintiff with panic disorder, compulsive traits, and opiate dependence.  Tr. at 458.  She noted that Plaintiff was "markedly ill" in terms of mental illness and Plaintiff admitted that she had "messed up" over the weekend by taking Oxycontin and Morphine.  *Id.* at 457.  Ms. Proehl found that Plaintiff's thought process, perception and cognition were within normal limits, but she was craving opiates and she was anxious.  *Id*.

On May 30, 2007, Plaintiff presented to Nurse Proehl for counseling and reported that she was kicked out of rehabilitation.  Tr. at 459.  She reported that she was depressed, struggling to stay off of opiates and was still nervous.  *Id*.  Ms. Proehl noted that Plaintiff's thought process, thought content, perception and cognition were all within normal limits, but her mood was anxious and depressed and her behavior was irritable.  *Id.*  She opined that Plaintiff was "markedly ill" and modified Plaintiff's medications.  *Id*. at 459-460.  She diagnosed panic disorder in partial remission

and opiate dependence. *Id*. at 460.

On June 7, 2007, Nurse Proehl's progress notes indicate that Plaintiff presented for counseling and reported that she was using opiates almost daily. Tr. at 461. Ms. Proehl noted that Plaintiff was preoccupied with getting opiates and she suggested that Plaintiff explore residential rehabilitation. *Id.* at 462.

July 13, 2007 progress notes indicated that Plaintiff was taking Suboxone, Vistaril, and Trazadone, as well as Zoloft. Tr. at 463-464. Plaintiff was assessed as "moderately ill" and Plaintiff indicated a desire to work and to get her high school diploma. *Id*. at 464.

On July 18, 2007, progress notes indicate that Plaintiff was in detoxification for two days and was one week sober. Tr. at 465. Plaintiff reported that she was doing "great" on Suboxone and had no cravings. *Id.* Nurse Proehl indicated that Plaintiff was "markedly ill" and she was very sedated even with decreases in Vistaril and Trazadone. *Id.* at 466. Plaintiff reported increased obsessive compulsive disorder symptoms and anxiety with the decreased Zoloft dosage. *Id.* Zoloft was increased, Vistaril was held, and Plaintiff agreed to attend twelve-step meetings. *Id.* Plaintiff was diagnosed with panic disorder in partial remission and opiate dependence in early remission. *Id.*

August 10, 2007 progress notes show that Plaintiff was doing better on an increased dosage of Suboxone and was sober for the past thirty days. Tr. at 467. She was assessed as "moderately ill" and indicated that her goal was to get a job. *Id*. at 467-468. On September 7, 2007, Plaintiff reported sixty days of sobriety, which was her longest period ever, and she was "very pleased." *Id.* at 469-470. October 5, 2007 progress notes show that Plaintiff's mood was stable and she was sleeping well and staying busy at ninety days of sobriety. *Id.* at 471.

Plaintiff continued to treat at Neighboring and on December 28, 2007, she reported that she was doing "wonderful" and had her first sober holiday. Tr. at 477. On March 24, 2008, Plaintiff reported that she was eight months sober. *Id*. at 484.

On April 7, 2008, Plaintiff had an urgent visit with Ms. Proehl, reporting that she was crying more often and was more depressed and overwhelmed. Tr. at 487. Some of her medications were modified. *Id.* at 488.

-4-

On April 21, 2008, Western Reserve Counseling Service performed a diagnostic assessment and initial interview of Plaintiff.  Tr. at 441.  Some of the handwritten notes of the assessment are illegible, as well as the person's name who conducted the assessment, but indicated that Plaintiff had intact thoughts, impaired memory, adequate judgment, good perception and she was oriented.  *Id*. at 442.  The evaluator diagnosed Plaintiff with major depressive disorder, with a rule out of bipolar disorder, polysubstance abuse in early remission, and assigned Plaintiff a global assessment of functioning ("GAF") at 65, which indicated mild symptoms.  Plaintiff began counseling at Western Reserve and May 8, 2008 treatment notes indicate that Plaintiff was feeling a little happier on an increased dose of Prozac.  *Id.* at 452.  Plaintiff reported that her doctor wanted to do a colonoscopy and he was going to call her psychiatrist to determine which drug to give her for sedation as she insisted that he could not use a narcotic for sedation because she was taking Suboxone.  *Id.*

On June 2, 2008, Plaintiff presented to Ms. Proehl and reported that her mood was better and she was almost one year sober.  Tr. at 493.  She was still receiving therapy from Kelly Christy at Western Reserve and her thought process, perception, mood, behavior and cognition were all within normal limits.  *Id.*  Plaintiff presented for counseling on June 3, 2008 and reported that she felt close to relapsing after she watched a television show that showed someone shooting up heroin.  *Id*. at 795.  She noted that her two sisters continued to abuse substances.  *Id*.  She also reported an urge to use at her June 23, 2008 session when her sister asked to borrow money in order to buy drugs.  *Id*. at 796.  Plaintiff did not give her sister money.  *Id.*  When Plaintiff indicated that the father of her child bought himself a new cell phone but was behind in child support payments, the counselor suggested that Plaintiff start working.  *Id*.  Plaintiff was not motivated.  *Id*.

Progress notes from Neighboring for July of 2008 show that Plaintiff was feeling good, attending AA four times per week, and was cleaning houses for money.  Tr. at 660-664.

Plaintiff reported on August 8, 2008 that she was doing "OK" and she was cleaning houses.  Tr. at 569.  She reported that her purse with her Suboxone in it was stolen at an AA meeting.  *Id*.

September 17, 2008 notes from Neighboring indicated that Plaintiff had her one-year sobriety anniversary and she reported that she still had some cravings.  Tr. at 565.  She was attending AA four times per week.  *Id*. at 566.

On October 8, 2008, progress notes from Neighboring indicated that Plaintiff was doing well and she was coping better with stress.  Tr. at 563.  Mental status examination was normal.  *Id.*

On December 11, 2008, Plaintiff reported to Neighboring that she was still sober but it was hard.  Tr. at 557.  Plaintiff reported at her counseling session that she was cleaning houses and she wanted to get a full-time job when her daughter began kindergarten in the fall.  *Id*. at 594.  She also indicated that her sister kept asking for some of her Suboxone*. Id.*

Progress notes dated January 8, 2009 through March of 2009 from Neighboring indicate that Plaintiff was doing well and remaining sober, but she complained of increasing depression and low energy in March of 2009.  Tr. at552-555.

January 26, 2009 counseling notes indicate that Plaintiff was maintaining her sobriety and doing more at AA.  Tr. at 597.  She reported that her mom had surgery and was taking Vicodin and she was not even tempted to take any even though she knew where her mom kept them.  *Id*.  She expressed frustration about the father of her child who was behind on child support and the fact that her parents were supporting her and her daughter, but she was not motivated to work.  *Id*.

On May 26, 2009, Plaintiff reported doing well and her mental status examination was within normal limits.  Tr. at 543-544.

On July 6, 2009, Plaintiff was given 12 extra Suboxone after claiming that she lost them at an AA meeting.  Tr. at 537.  She denied overuse.  *Id*.  On July 13, 2009, Plaintiff reported at counseling that she loaned 7 Suboxone pills to her friend and she was short of pills for herself, but then admitted that this was a lie and she had given the pills to her sister.  *Id*. at 611.

On August 4, 2009, Plaintiff reported that she was "good" and her mood and anxiety were "ok."  Tr. at 535.  She was still attending AA.  *Id*.  Her eye contact was decreased, she was preoccupied with her Suboxone use, and she wanted medications for her complaints of anxiety.  *Id.*

On August 20, 2009, Plaintiff reported racing thoughts, problems focusing, and mood swings.  Tr. at 533.  She was now two years sober.  *Id*.

On August 31, 2009, Plaintiff reported to Ms. Proehl that she was "good" and her mental status examination was within normal limits.  Tr. at 531.

-6-

On September 9, 2009, Plaintiff reported at counseling that her doctor had started her on Lamictal and it made her calmer with no side effects.  Tr. at 614.  She reported that she was sponsoring someone at AA and almost came close to using heroin when someone showed up needing to talk and was high.  *Id.*

On October 5, 2009, Plaintiff reported that she almost relapsed and she was pushing to take more Suboxone.  Tr. at 703-704.  On October 8, 2009, Plaintiff presented to counseling and reported that she had been having dreams of using drugs but had maintained her sobriety.  *Id*. at 617.  She felt overwhelmed and was easily distracted.  *Id.*

On November 4, 2009, Dr. Krause, M.D. examined Plaintiff at the request of the agency.  Tr. at 618.  He noted Plaintiff's emotional problems, substance abuse issues, and her physical problems of endometriosis, a partial colectomy, removal of a fallopian tube and hysterectomy, and repair of a ventral hernia.  *Id.*  Dr. Krause diagnosed Plaintiff's history of emotional problems, substance abuse, and history of endometriosis, which was asymptomatic following a complete hysterectomy in 2006.  *Id*. at 619.  He noted that Plaintiff carried on all daily living activities.  *Id.*

On November 16, 2009, Dr. Katz, Ph.D. reviewed Plaintiff's file and completed a psychiatric review technique form and mental RFC assessment.  Tr. at 624-642.  In her mental RFC assessment, Dr. Katz opined that there was no evidence that Plaintiff was limited in:  understanding and remembering very short and simple instructions or locations or work-like procedures; being aware of normal hazards and taking appropriate precautions; and in traveling in unfamiliar places or using public transportation.  *Id.* at 624-625.  Dr. Katz found that Plaintiff was not significantly limited in:  understanding, remembering and executing detailed instructions; performing activities within a schedule, maintaining regular attendance and being punctual; sustaining an ordinary routine without special supervision; asking simple questions or requesting assistance; maintaining socially appropriate behavior and adhering to basic standards of neatness and cleanliness; and in setting realistic goals or making plans independently of others.  *Id.*  She further found that Plaintiff was moderately limited in:  maintaining attention and concentration for extended periods; working in coordination with or proximity to others without being distracted by them; making simple work-related decisions; completing a normal workday and workweek without interruptions from

-7-

psychologically-based symptoms and to perform at a consistent pace without an unreasonable number and length of rest periods; interacting appropriately with the general pubic; accepting instructions and responding appropriately to criticism from supervisors; getting along with co-workers or peers without distracting them or exhibiting behavioral extremes; and in responding appropriately to changes in the work setting.  *Id.*  Dr. Katz found Plaintiff markedly limited in none of the areas listed.  *Id.*  Dr. Katz opined that Plaintiff could understand, remember and execute simple and somewhat complex tasks, her symptoms tended to interfere with the ability to maintain close consistent attention to detail, Plaintiff could make simple decisions, relate to co-workers and supervisors on a superficial basis and she could deal with the public on a limited basis only.  *Id*. at 627.  She further opined that Plaintiff would need a calm, consistent setting with clear performance expectations and no fast-paced production quotas*.  Id.*

In the psychiatric review technique form, Dr. Katz reviewed Plaintiff's case on the basis of Listing 12.04 for affective disorders for her diagnosis of major depression, Listing 12.06 for anxiety-related disorders for her panic disorder, and Listing 12.09 for substance addiction disorders.  Tr. at 628.  Dr. Katz opined that Plaintiff had mild limitations in her activities of daily living due to her mental disorders, moderate limitations in maintaining social functioning and in maintaining concentration, persistence or pace, and no episodes of decompensation or deterioration.  *Id*. at 638.

On December 20, 2009, Plaintiff reported that Christmas was "wonderful" and she was worried about her mother who had a heart condition.  Tr. at 710.

On January 28, 2010, Plaintiff reported to her counselor that when her mom was in the hospital, she relapsed and drank a bottle of vodka the first day and two beers the second day.  Tr. at 829.  She reported that it was stressful at home and she had now been sober for two weeks.  *Id*.  She admitted that she felt that she was "backsliding."  *Id*.

On February 4, 2010, Plaintiff presented to counseling indicating that she had told Dr. Martin of Neighboring about her relapse and that she had stolen some of her mom's checks and wrote checks totaling over $200.00.  Tr. at 830.

In February of 2010, Plaintiff presented to the emergency room complaining of a left finger laceration that occurred when she was cutting an orange.  Tr. at 730.  Apparently, after the laceration

was sutured, Plaintiff indicated that no one would help her and they were all a bunch of idiots.  *Id.* at 727.  She then yelled at her mother, who was with her, and passed out in the lobby, unwitnessed. *Id*. She had ripped out the sutures.  *Id.* at 732.  A behavioral health assessment while in the hospital indicated that Plaintiff had also stabbed herself in the abdomen with the intention of hurting herself to "feel better."  *Id.*  She reported that she was having thoughts of harming herself and others.  *Id*. Plaintiff reported feeling like another person and reported decreased sleep and appetite, racing thoughts and she had a labile affect.  *Id.*  She was diagnosed with bipolar disorder, most recent episode manic.  *Id*. at 734.

Hospital notes indicate that Plaintiff tested positive for PCP, although she denied using.  Tr. at 736.  Plaintiff was transferred to Marymount Hospital for acute mixed manic episode with suicidality.  *Id*. at 745, 751.  Plaintiff noted that she had been increasingly depressed and irritable over the past week and had poor sleep and appetite, excessive energy, poor concentration, increased impulsivity, feelings of hopelessness and crying jags.  *Id*.  She explained that she had been recently on Suboxone but had run out of medication.  *Id*.  Mental status examination revealed that Plaintiff was oriented, withdrawn but at times intrusive, angry and sulky, with suicidal thoughts, feelings of hopelessness and helplessness, labile affect, flight of ideas, erratic concentration, intact memory, and poor insight and judgment.  *Id*.  Dr. Ranjan diagnosed Plaintiff with bipolar disorder, mixed and severe without psychotic features, and she was rated a 25 GAF, which indicated serious impairment, with the highest GAF in the last year of 55, which indicated moderate symptoms.  *Id.*  She was admitted with recommended treatment to include pharmacology, psychotherapy and suicide precautions.  *Id.* at 752.

While in the hospital, Plaintiff's left finger became infected as she did not take the antibiotics originally prescribed.  Tr. at 759.  She was given IV antibiotics.  *Id*.  Plaintiff was transferred to another hospital for a surgical consult and a hand surgeon evaluated Plaintiff's finger and ordered the sutures removed and to continue the antibiotics.  *Id.* at 760.  However, Plaintiff was transferred back to Marymount because she was emotionally unstable and needed further evaluation and treatment.  *Id*. at 765.  Mental examination showed that Plaintiff was oriented, with a sulky mood, no evidence of suicidality, a mildly labile affect, no delusions or hallucinations, erratic

-9-

concentration, intact memory and limited insight and judgment.  *Id.* Her GAF was 30, which indicated serious impairment.  *Id.*  While in the hospital, Plaintiff got into a fight with another person, but had no pain or injury.  *Id.* at 773.  She was very focused on Suboxone and restarting its use.  *Id.* at 772.  Plaintiff was discharged from Marymount on February 24, 2010.  *Id.* at 776.

March 1, 2010 notes from Neighboring indicate that Plaintiff had relapsed and used cocaine two to three weeks ago when her mom was hospitalized.  Tr. at 779.  She also admitted stealing money from her parents and her dad was put in charge of her medications.  *Id.* at 780.  She was put back on Suboxone.  *Id.*

On March 1, 2010, Plaintiff's father attended counseling with her and reported that Plaintiff was selling her Suboxone to buy cocaine and stole over $900.00 from him and his wife through check writing and using his ATM card.  *Id.* at 831.  Plaintiff's dad said that he had set boundaries and he was now in charge of Plaintiff's medications.  *Id.*  He also indicated that he set boundaries with his other daughter as to asking Plaintiff and her mother for their medications.  *Id.*  Plaintiff also gave a mixed-up timeline of her mother' hospitalization and admitted that during that time, she was not only using alcohol, but also cocaine and crack.  *Id.*

On March 3, 2010, Dr. Martin of Neighboring completed an assessment of Plaintiff's mental RFC.  Tr. at 785.  She opined that Plaintiff's limitations were "marked" in every category identified.  *Id.* at 785-786.  She diagnosed Plaintiff with biopolar disorder II, borderline personality disorder, and polysubstance abuse and dependence.  *Id.* at 786.  She opined that Plaintiff would miss work more than three times per month due to her impairments or treatment, Plaintiff's condition would deteriorate under the stress of a job, and she concluded that Plaintiff's medications improved her ability to function.  *Id.*  She also commented that Plaintiff had very poor coping skills and depended upon her parents to care for her and her young child.  *Id.*

On March 8, 2010, Plaintiff's dad came to part of her counseling session and Plaintiff stated that she stole $60.00 out of her dad's pants pocket to pay for drugs and when she was leaving the house the next day, her father told her not to return.  Tr. at 832.  Plaintiff related that her parents told her that her daughter asked if she was coming back as she walked out of the door.  *Id.*  Plaintiff's father related that Plaintiff had stolen $260.00 from his safe and he told Plaintiff that they would

-10-

fight for custody of Plaintiff's daughter if Plaintiff did not abide by their rules. *Id.* Apparently, Dr. Martin had told Plaintiff that this last Suboxone restart was her last chance. *Id.* Plaintiff's father also wanted Plaintiff to come for more counseling sessions. *Id.*

On March 18, 2010, Plaintiff presented to the Windsor-Laurelwood Center for Behavioral Medicine and complained that she was depressed, anxious and having racing thoughts. Tr. at 1082. She explained to Dr. Macdougall, M.D. that her current stressor was that she was afraid that her parents would discover that she had been stealing checks from them and cashing them and they would kick her out of their house. *Id.* She reported anxiety, poor sleep, guilt and worthlessness and decreased concentration. *Id.* She reported losing 20 pounds over the last several months. *Id.* She denied suicidal thoughts, hallucinations or psychotic symptoms. *Id.* She reported that she last used cocaine in January of 2010. *Id.* Examination revealed normal speech, anxious affect, logical thought process, poor insight and judgment, intact memory and average intelligence. *Id.* Dr. Macdougall diagnosed Plaintiff with bipolar disorder, not otherwise specified, obsessive-compulsive disorder by history, opiate dependence, currently on Suboxone, and she rated her a GAF of 50, indicative of moderate symptoms. *Id.* at 1084. Dr. Macdougall resumed Seroquel for Plaintiff. *Id.* at 1085. On April 8, 2010, Plaintiff presented for counseling and indicated that her father controlling her medications was going well. Tr. at 850. However, she admitted that she stole and wrote checks from a woman whose house she cleaned and used her credit card. *Id.* She was now facing 9 felony charges. *Id.* She stated that she stole the money to pay drug dealers and she was now sober. *Id.* She indicated that Dr. Martin was drug testing her and she was still taking Suboxone and her other medications. *Id.*

On April 19, 2010, Dr. Hoyle, Psy.D reviewed Plaintiff's file for the agency and affirmed the agency reviewing psychologist's decision of November 16, 2009. Tr. at 851. She noted that Plaintiff had alleged the worsening of her psychological symptoms starting in January of 2010 and those symptoms did get worse, but the treatment notes from Plaintiff's counseling showed that after Plaintiff's mom had a heart attack, Plaintiff relapsed on drugs and alcohol, stabbed herself in the stomach, stole from her parents, and was off of her medications while she was using drugs. *Id.* Dr. Hoyle noted that once Plaintiff participated in an intensive outpatient program for her drug and

-11-

alcohol abuse issues and was back on her medications after getting sober, she demonstrated improvement in her mental conditions, such that the marked limitations opined by her treating psychiatrist were not supported.  *Id.*

In May of 2010, progress notes from Neighboring indicate that Plaintiff acknowledged to using benzodiazepines as she was sick of her family and her mom was still very upset with her.  Tr. at 854.  Her medications were adjusted and Abilify was added.  *Id.* at 855.

June 2010 counseling notes indicate that Dr. Martin was starting to wean Plaintiff off of Suboxone and Plaintiff was upset by this decision.  Tr. at 942.  Dr. Martin did so because drug testing showed that Plaintiff had benzodiazepines in her system.  *Id*. at 943.  Plaintiff also discussed her upcoming court dates for stealing a client's money and the fact that she was not eligible for mental health court because the victim was disabled and elderly.  *Id*. at 942.  They also discussed the possibility of Plaintiff having to go to jail and the impact of this on her daughter.  *Id.* at 944.

On July 1, 2010, Dr. Martin completed a medical statement regarding Plaintiff's bipolar disorder and related conditions.  Tr. at 951.  She listed Plaintiff's diagnosis as bipolar disorder II and rated Plaintiff's current GAF at a 40, indicative of serious symptoms.  *Id*.  She affirmed that Plaintiff had suffered from this severe level of impairment since 2006, which worsened with Plaintiff's abuse of opiates.  *Id*.  Dr. Martin opined that Plaintiff was moderately limited in her daily living activities, markedly limited in maintaining social functioning and had deficiencies in her concentration, persistence or pace and repeated episodes of decompensation or deterioration.  *Id.* at 951-952.  More specifically, Dr. Martin opined that Plaintiff was not significantly impaired in asking simple questions or requesting assistance.  *Id*. at 952.  She opined that Plaintiff was moderately limited in: understanding, remembering and executing short and simple instructions; sustaining an ordinary routine without special supervision; and working in coordination with and proximity with others without being distracted by them.  *Id*.  She further opined that Plaintiff was markedly limited in: remembering locations and work-like procedures; understanding, remembering and executing detailed instructions; maintaining attention and concentration for extended periods; performing activities within a schedule, maintaining regular attendance, and be punctual; making simple, work-related decisions; completing a normal workday/workweek without interruptions from

-12-

psychologically-based symptoms and performing at a consistent pace without an unacceptable number and length of rest periods; interacting appropriately with the general public; accepting instructions and responding appropriately to criticism from supervisors; getting along with co-workers or peers without distracting them or exhibiting behavioral extremes; maintaining socially appropriate behavior and adhering to basic standards of neatness and cleanliness; responding appropriately to changes in the work setting; being aware of normal hazards and taking appropriate precautions; traveling in unfamiliar places or using public transportation; and setting realistic goals or making plans independently of others.  *Id.* Dr. Martin opined that Plaintiff would be absent from work more than three times per month due to her impairments and treatment.  *Id.* at 953.

Counseling notes from July 2010 indicate that Plaintiff was concerned about being weaned off of Suboxone and wanted something to help her with her anxiety which had been a problem for a year and manifested itself as an obsessive/compulsive disorder.  Tr. at 1003.  Plaintiff admitted in her July 15, 2010 session that she used heroin the prior Saturday.  *Id.* at 1004.  July 22, 2010 notes indicate that her father got a durable power of attorney over her and her daughter.  *Id.* at 1005.  Plaintiff also admitted that she used heroin in the bathroom at an AA meeting.  *Id.*  She also stated that she found a purse at a pool and returned it to staff, but the woman who owned the purse thought that Plaintiff stole it.  *Id.*

On July 14, 2010, Dr. Martin completed a mental RFC form in which she affirmed her July 1, 2010 assessment and opined that Plaintiff was markedly limited in every area.  Tr. at 955-956. She stated Plaintiff's diagnoses as bipolar II disorder and substance abuse and opined that Plaintiff's condition would likely deteriorate if she were placed under job stress.  *Id.* at 956.

On July 26, 2010, Dr. Martin completed a medical statement regarding Plaintiff's mental impairments with possible substance abuse.  Tr. at 957.  She indicated that she has been treating Plaintiff since 2007 and rated her current GAF at 55, indicating moderate symptoms.  *Id.*  She indicated that Plaintiff was currently abusing drugs or alcohol and also affirmed that if Plaintiff were unable to obtain drugs or alcohol, she would still have significant mental illness and would still be significantly mentally ill.  *Id.*

-13-

From July 24, 2010 to July 28, 2010, Plaintiff was admitted to the hospital after she was taken to the emergency room for making suicidal threats at the police department.  Tr. at 959. Plaintiff indicated that she had taken Percocets and had a suicidal ideation with a plan to shoot heroin.  *Id.*  Plaintiff had been arrested on July 24, 2010 for stealing a woman's purse and she reported that she had used heroin one day prior and her arm had become swollen and tender.  *Id*. at 960-961.  Plaintiff was involuntarily admitted for evaluation, stabilization and treatment for opioid dependence, cocaine dependence and suicidal ideation.  *Id.* at 961.  Her arm was also treated for phlebitis.  *Id*. at 959.

July 29, 2010 notes from Dr. Martin indicate that Plaintiff was done with Suboxone and was taking Abilify, Prozac, Lamictal and Vistaril.  Tr. at 1012.  She requested Ativan and Klonopin, but Dr. Martin refused.  *Id.*

Plaintiff attended counseling on August 2, 2010 and explained her behavior at the police station and hospitalization.  Tr. at 1006.  She indicated that Dr. Martin refused to give her anything for her anxiety and that day was her last day on Suboxone.  *Id.*

On August 9, 2010, Plaintiff presented to the emergency room complaining of auditory hallucinations.  Tr. at 964.  She said that she had been anxious and depressed over the last week and used heroin three days ago and took Vicodin before she came to the emergency room.  *Id.*  Plaintiff was seen again in the emergency room on August 19, 2010 for anxiety, suicidal and homicidal thoughts.  *Id*. at 1217.  She reported her recent admission and stated that she was just released the day before, but she came back because she felt like she wanted to hurt herself or others.  *Id*. She was diagnosed with anxiety, depression and homicidal.  *Id*.

On September 2, 2010, Plaintiff presented to the emergency room complaining of suicidal thoughts, depression, agitation and intentional IV drug overdose of cocaine and heroin.  Tr. at 1239. She indicated that she wanted to kill herself and hurt her daughter.  *Id*. at 1241, 1260.  She was transferred to the psychiatric unit for diagnoses of bipolar disorder and depression.  *Id.* at 1248. Plaintiff admitted injecting cocaine earlier that day and injecting heroin the day before.  *Id*. at 1264. She stated that she was kicked out of Laurelwood because of a positive urine test and missing a few days.  *Id.*  She reported insomnia, guilt over her drug use, increased agitation, and difficulty

-14-

concentrating. *Id*. Inpatient treatment was recommended for stabilization and safety. *Id*.

On September 10, 2010, Plaintiff presented to Lake Health Behavioral Health stating that she wanted to overdose on heroin and die because she had too many legal stressors and she was taking too many medications that made her feel "not right." Tr. at 1287. Her GAF was rated as 25, indicative of serious impairment. *Id*. Plaintiff was admitted to the hospital through September 13, 2010. *Id*. at 973. Plaintiff's substance abuse history was noted, as well as her legal history, with admitting physician Dr. Stansbrey indicating that eleven criminal charges were pending against Plaintiff and she was in jail ten days prior to her hospital admission. *Id*. Plaintiff was stabilized at the hospital but prior to her discharge, she told the night shift that she was going to use heroin. *Id*. at 973. Dr. Stansbrey stated that Plaintiff's prognosis was good if she would be compliant and abstain from alcohol and drugs. *Id*. at 973-974.

On October 10, 2010, Dr. Martin saw Plaintiff in jail and her progress notes indicated that Plaintiff entered a guilty plea to theft charges and was sentenced to thirty days of jail plus treatment at Northeast Ohio Community Alternative Program ("NEOCAP") and three years of probation to follow. Tr. at 1009-1010. Dr. Martin increased Plaintiff's Prozac. *Id*.

On January 5, 2011, Plaintiff was taken to the emergency room complaining of depression, anxiety and suicidal ideation. Tr. at 1021. She was transferred to another facility for stabilization with a diagnosis of major depression with suicidal ideation. *Id*. at 1023. Plaintiff was discharged on January 9, 2011 with diagnoses of adjustment disorder with depressed mood, heroin addiction in early remission and rule out dysthmia. *Id*. at 1066. Her medications were adjusted and Plaintiff was not required to return to NEOCAP but was to go home to her family and participate in outpatient drug and alcohol treatment. *Id*. The Program Director for NEOCAP wrote a letter indicating the circumstances of Plaintiff's admission to the hospital, explaining that Plaintiff was administratively released on January 5, 2011 after reporting persistent thoughts of harming herself and she was thereafter released to her family on January 9, 2011. *Id*. at 1126. The letter indicated that Plaintiff was initially ordered to return to NEOCAP on January 11, 2011 and within an hour of her arrival, Plaintiff lost consciousness and staff members called 911. *Id*. Plaintiff regained consciousness before the paramedics arrived and stated that she had taken 10 Seroquel, 4 Ultram and

-15-

6 Dilaudid in order to overdose. *Id*. She reported that she got the Ultram and Dilaudid from her sister when she was at home the day before and she took the Seroquel on the way back to NEOCAP while driving with her father who had gone into the gas station. *Id*. The Program Director concluded that "Ms. Sarli's unstable mental and emotional state coupled with her attempt to overdose immediately prior to returning to NEOCAP clearly indicates that she is not amenable to treatment and has no desire to address her criminogenic needs." *Id*. at 1127. NEOCAP therefore negatively terminated Plaintiff from its facility and supervision was transferred to the Lake County Adult Probation Department. *Id*.

The hospital records indicate the emergency room presentation on January 11, 2011 and reported that Plaintiff stated that she had overdosed by taking 10 Seroquel, 6 Ultram and 4 Clonidine. Tr. at 1013, 1016. Plaintiff's mood was described as cooperative and depressed with a calm affect and Plaintiff was having thoughts of suicide. *Id*. at 1015. Plaintiff was transferred to a receiving hospital for stabilization and treatment for diagnoses of bipolar disorder, depressed, hypoglycemia and ingestion/exposure to psychiatric drugs polypharmacy. *Id*. at 1015. She was hospitalized from January 12, 2011 through January 14, 2011 with final diagnoses of bipolar disorder, not otherwise specified, polysubstance dependence with opiates, antisocial personality disorder, and she was rated a GAF of 20 at admission and 50 upon discharge. *Id*. at 1029. She reported that she was overwhelmed due to her legal involvement and IV drug use, as well as her incarceration from September through December 2010 with supervision until 2013. *Id*. at 1030. Mental status examination showed good eye contact, dysphoric mood, restricted affect, preoccupation with her stressors, poor insight, and feelings of helplessness, hopelessness and worthlessness. *Id*. at 1031. She had no thoughts of suicide and her medications were resumed, including Seroquel, Prozac, and Lamictal. *Id*. at 1032.

On January 21, 2011, Dr. Martin saw Plaintiff in jail after she violated her release conditions by overdosing on drugs. Tr. at 1062. She stated that she did not feel like herself and could not cope at NEOCAP. *Id*. Dr. Martin noted that Plaintiff clearly understood what she had done to violate her probation and in the past when she was caught, she would attribute it to another person. *Id*. Dr. Martin noted that Plaintiff had incredibly poor coping skills and needed intensive counseling. *Id*.

-16-

While in prison, Dr. Miller, Ph.D., completed a mental health evaluation of Plaintiff.  Tr. at 1124.  He noted Plaintiff's symptoms of mood instability, racing thoughts, insomnia, irritability and impulsiveness.  *Id*.  His diagnoses were bipolar disorder, not otherwise specified, cocaine dependence, opioid abuse, and rule out borderline personality disorder, with a GAF of 60, indicative of mild symptoms.  *Id*.

While in prison, Plaintiff was referred to mental health services on numerous occasions.  On March 26, 2011, Plaintiff stated that she felt depressed and unstable, was hearing voices, and she felt like hurting herself. Tr. at 1148.  On April 6, 2011, Plaintiff was found cutting herself with a razor.  *Id.* at 1145.  She stated that she wanted to hurt herself and felt that way because her old medications were discontinued and she was placed on Lithium.  *Id.* at 1146.  On April 9, 2011, Plaintiff reported that she was having "bad thoughts" and needed to see a doctor.  *Id*. at 1144.  She was placed on constant suicide watch.  *Id*.  Therapy notes from the prison show that Plaintiff was doing well in May of 2011 with Lithium and reported no problems with her mood, sleep, energy or suicidal thoughts.  *Id.* at 1152.  June 2011 notes indicate that Plaintiff had increased anxiety and agitation after she found out that her mother had a heart attack and she feared that something would happen to her mother before she was released on June 22, 2011.  *Id*. at 1151.

Plaintiff was released from prison in June of 2011 and followed up with Neighboring.  Tr. at 1094.  August 3, 2011 progress notes indicate that Plaintiff had been off all medications for the last five weeks and had lost twenty pounds in prison.  *Id.* at 1095.  Plaintiff reported that she had been sober since September of 2010 and she was attending AA meetings four times per week.  *Id.* at 1094.  Dr. Martin prescribed Latuda for her anxiety.  *Id*. at 1106.

August 2011 counseling notes show that Plaintiff was reassessed and she reported that she had stopped taking Latuda because it made her too tired.  Tr. at 1107.  September 2011 Neighboring notes indicate that Plaintiff was sober and had no cravings, she was taking Latuda and Trazadone, and she was enjoying her family.  *Id.* at 1110.  October 2011 counseling notes indicate that Plaintiff was concerned about her mother's heart condition and Plaintiff reported helping her mom with everything.  *Id.* at 1206.  Plaintiff reported that her sister had accused her of taking Oxycontin out of her purse but Plaintiff denied it.  *Id*.  Plaintiff insisted that she was maintaining her sobriety.  *Id.*

-17-

at 1207. She was attending AA and Narcotics Anonymous ("NA") three times per week. *Id.* at 1213. November 2011 Neighboring notes indicate that Plaintiff and her family were "good." *Id.*

On December 8, 2011, Plaintiff was taken to Lake Health emergency room by Mentor Police after she initially told police that an unknown person had stabbed her but then admitted that she had stabbed herself with a kitchen knife. Tr. at 1308. She reported increased depression over health problems of gastrointestinal and kidney pain that was becoming unbearable. *Id.* She stated that she had suffered from hydronephrosis and pancreatitis. *Id.* at 1327. She indicated that she had racing thoughts, increasing anxiety and she was tearful, helpless and hopeless. *Id.* at 1308. She agreed to inpatient treatment and was diagnosed with bipolar disorder and major depressive disorder. *Id.* at 1310. She related that she had stopped using drugs upon her release from prison in 2010, but a toxicology screen upon her admission showed positive results for barbiturates, benzodiazepines and opiates. *Id.* at 1328-1329. On December 10, 2011, a peer reported that Plaintiff had stabbed herself with a pen and an ink pen was observed protruding from Plaintiff's previous self-inflicted wound. *Id.* at 1341. She was given a GAF of 20, indicating some danger of hurting herself or others. *Id.* She was medicated, the pen was removed, and the wound was cleaned. *Id.* Plaintiff received medications and therapy and was discharged on December 12, 2011 after she demonstrated insight and improvement in her judgment and she felt that she could safely return home. *Id.* at 1341. She was released with diagnoses of bipolar disorder, not otherwise specified, and borderline personality disorder. *Id.* at 1327. She was given a GAF of 51-60 upon discharge, indicative of moderate symptoms. *Id.*

Neighboring notes indicate that Dr. Martin saw Plaintiff on December 13, 2011 and Plaintiff explained the stabbing and her hospital stay. Tr. at 1408. She described depression over her mom's medical condition and her medical conditions. *Id.* Her laboratory results showed that she was sober and her medications were unchanged. *Id.* Dr. Martin noted that Plaintiff's dad had brought her in and Dr. Martin believed that Plaintiff was very unstable and could not keep herself safe. *Id.* at 1408-1409. She completed a "pink slip" for Plaintiff to be admitted to the hospital because Plaintiff could not make a contract for safety. *Id.* at 1409.

On January 23, 2012, Neighboring notes show that Plaintiff complained of anxiety and an inability to focus due to her mother's illness.  Tr. at 1404-1405.  Medications were changed and Haldol was decreased.  *Id.*  On the same date, Dr. Martin completed a form entitled "Bipolar Disorder and Related Conditions-Condition Prior to December 2010 and Continuing."  *Id.* at 1411. She indicated that she first saw Plaintiff in 2007 and most recently saw her on January 23, 2012. *Id.*  She rated Plaintiff's current GAF as 40-45, indicative of serious impairment.  *Id.* Dr. Martin opined that Plaintiff was markedly limited in daily living activities and maintaining social functioning, and she had deficiencies in concentration, persistence or pace and repeated episodes of decompensation and deterioration.  *Id.*  She found Plaintiff markedly limited in every area.  *Id.* at 1412.  She completed a medical source statement in which she affirmed that Plaintiff suffered from a bidirectional form of bipolar disorder with substance abuse.  *Id.* at 1413.  She noted that Plaintiff used drugs to self-medicate her bipolar disorder and she used them recreationally as well. *Id.*  She indicated that Plaintiff was currently sober, and she would still suffer from bipolar disorder and would still be significantly mentally ill even if she were unable to obtain drugs of abuse or alcohol.  *Id.* She identified Plaintiff's other diagnosis as borderline personality disorder.  *Id.* at 1414-1415.

On January 30, 2012, Plaintiff was transferred to a psychiatric unit from the emergency room after complaining of command auditory hallucinations and suicidal ideations.  Tr. at 1418.  Plaintiff reported that her functioning had declined over the past week and she heard a female voice whispering to her that she should hurt herself and asking "what are you going to do?"  *Id.*  She stated several times that she did not want to die and she listed recent stressors as her mother's illness and her recent ventral hernia.  *Id.* Plaintiff was admitted to the hospital and given Haldol and Neurontin. *Id.*  During her admission, Plaintiff showed medication-seeking behaviors and was dishonest about her history of heroin dependence.  *Id.*  Plaintiff's toxicology test was negative.  *Id.* at 1419. Plaintiff's father indicated that he thought that Plaintiff was manipulating the system.  *Id.* at 1418. Plaintiff was discharged in stable condition on February 1, 2012 with diagnoses of mood disorder and anxiety disorder, not otherwise specified, and heroin and cocaine dependence currently in remission.  *Id.*  She was also diagnosed with borderline personality disorder features.  *Id.*  Her GAF

was rated at 40, indicative of serious symptoms. *Id.*

On February 11, 2012, Plaintiff presented to the emergency room for depression and suicidal ideations. Tr. at 1436. She was given Ativan for bipolar disorder and discharged with a psychiatric referral. *Id.* at 1436-1438.

## III. HEARING TESTIMONY

At the hearing before the ALJ, Plaintiff testified that she and her daughter lived with her parents and she has not had a driver's license since 2001 when it was taken away due to a driving under the influence conviction. Tr. at 42. She explained that she can get it back but has to pay a big reinstatement fee. *Id.* Plaintiff is a high school graduate and she last worked part-time in 2005 at a deli as a meat cutter. *Id.* at 44. She left that job as she became overwhelmed because of all the people there. *Id.* Prior to that, she worked full-time at Ohio Elastomers on a molding line but she quit because it was too stressful. *Id.* at 45-46.

The ALJ asked Plaintiff to explain why she could not work and she indicated that she gets overwhelmed, stressed, and has panic attacks. Tr. at 46. She explained that there is no particular trigger, that it "just comes and goes. It's because I'm depressed. It's racing thoughts." *Id.* at 47. When asked when this began, Plaintiff indicated that she was hit by a car when she was five and almost died and then when her mom got sick, it triggered more of these feelings. *Id.*

When asked about her drug history, Plaintiff explained that she has been clean since September of 2010 and she used to use crack and heroin. Tr. at 47. She related that she was incarcerated in Marysville prison from March 4, 2011 to June 22, 2011 for attempted burglary and theft of checks. *Id.* Prior to that, she was in the county jail for five months. *Id.* at 48. She explained that she was not sober when she committed these crimes, which occurred prior to September of 2010. *Id.* at 4.

Plaintiff's counsel then asked her questions about her treatment with Dr. Martin which began in 2007. Tr. at 49. She related that she sees Dr. Martin once per month for her bipolar disorder and borderline personality disorder. *Id.* at 50. She explained that her bipolar disorder causes her to have real highs and lows and she was now taking Trazodone, Haldol, Cogentin, Vistaril and Prozac. *Id.* at 51. She stated that it took some time to get the right medications and dosages and she was

comfortable with the medications that she was currently on and experienced no side effects. *Id.* Plaintiff further testified that she quit using illicit drugs in September of 2010 because she went to jail. *Id.* at 53. She affirmed that she was only out of jail or prison for two days between September of 2010 to June 22, 2011. *Id.* at 54. She stated that she was sober in prison and still had mental health issues and was on suicide watch when she was in the jail as she wanted to end her life. *Id.* at 55. However, Plaintiff admitted that during that time and the time that she overdosed in jail, she was not really compliant with her medications. *Id.* Plaintiff testified that she is sober now and still has symptoms from her mental health disorders, but the medications help keep her on an even keel. *Id.* at 57.

Plaintiff testified as to her daily living activities, indicating that she takes care of her daughter and took care of every need of her sick mother before she died. Tr. at 60. She reported that she had no hobbies and went to church occasionally and no longer attended AA or NA. *Id.* at 61-62. She helps her daughter with homework. *Id.* at 62. She believed that she could not work full-time right now because she cannot take the stress and cannot be around too many people. *Id.* at 69.

The VE then testified. Tr. at 70. The ALJ presented a hypothetical person with Plaintiff's age, education and work background, with no physical limitations, but limitations to simple, routine, repetitive tasks, no strict production quotas, no work requiring negotiation, arbitration, resolution of disputes between parties, occasional changes in the work setting, occasional contact with the general public, co-workers and supervisors, and a 5% off-task limitation. *Id.* at 71-72. The VE testified that such a person could perform Plaintiff's past relevant work as a car porter and molding machine operator, and could perform other jobs existing in significant numbers in the economy, such as packager, mail clerk and kitchen helper. *Id.* at 72-73.

The ALJ thereafter modified the hypothetical person to jobs having no contact with the general public and infrequent contact with co-workers and supervisors. Tr. at 73. The VE testified that such a person could still perform the past relevant work of machine operator and the other jobs of packager and kitchen helper. *Id.* at 73-74. The ALJ again modified the hypothetical person to change the off-task limitation from 5% to 20%. *Id.* at 75. The VE testified that no jobs would be available for such a person. *Id.*

-21-

Plaintiff's counsel questioned the VE, adding a restriction that the hypothetical individuals already presented would also be absent from work three times per month or more due to their impairments or treatment for their impairments.  Tr. at 76.  The VE testified that there would be no work for such a person.  *Id*.

**IV**.    **SUMMARY OF RELEVANT PORTIONS OF THE ALJ'S DECISION**

The ALJ found that Plaintiff had the following severe impairments: depressive disorder, bipolar disorder and polysubstance dependence.  Tr. at 14.  The ALJ determined that Plaintiff's impairments, including her substance use disorders, met Listings 12.04 and 12.09 of 20 C.F.R. Part 404, Subpart P, Appendix 1 ("Listings").  *Id*.  The ALJ next determined that if Plaintiff stopped substance use, her remaining limitations would have more than a minimal impact on her ability to perform basic work activities, which meant that Plaintiff would continue to have severe impairments.  *Id.* at 17.  The ALJ further found that if she stopped substance use, Plaintiff would not have an impairment or combination of impairments that would meet or medically equal the Listings. *Id*.

The ALJ further found that if Plaintiff stopped substance use, she would have the residual functional capacity ("RFC") to perform a full range of work at all levels but with the following nonexertional limitations: simple, routine, repetitive tasks; being off-task five percent of the workday due to symptoms of her mental impairments; no strict production quotas; no work involving negotiation, arbitration, and resolution of disputes between opposing parties; only occasional changes in the work setting; tasks involving no contact with the general public and no more than infrequent contact with co-workers and supervisors.  Tr. at 19.  The ALJ determined that if Plaintiff stopped substance abuse, she would be able to return to her past relevant work as a molding machine operator with the RFC that he determined.  *Id*. at 23.  The ALJ concluded that because Plaintiff's substance use was a contributing factor material to the determination of disability, she was not disabled.  *Id*. at 24.

**V.**    **STEPS TO EVALUATE ENTITLEMENT TO SOCIAL SECURITY BENEFITS**

    **A.**    **The Standard Five-Step Process**

An ALJ must proceed through the required sequential steps for evaluating entitlement to

DIB or SSI. These steps are:

1. An individual who is working and engaging in substantial gainful activity will not be found to be "disabled" regardless of medical findings (20 C.F.R. §§ 404.1520(b) and 416.920(b) (1992));

2. An individual who does not have a "severe impairment" will not be found to be "disabled" (20 C.F.R. §§ 404.1520(c) and 416.920(c) (1992));

3. If an individual is not working and is suffering from a severe impairment which meets the duration requirement, see 20 C.F.R. § 404.1509 and 416.909 (1992), and which meets or is equivalent to a listed impairment in 20 C.F.R. Pt. 404, Subpt. P, App. 1, a finding of disabled will be made without consideration of vocational factors (20 C.F.R. §§ 404.1520(d) and 416.920(d) (1992));

4. If an individual is capable of performing the kind of work he or she has done in the past, a finding of "not disabled" must be made (20 C.F.R. §§ 404.1520(e) and 416.920(e) (1992));

5. If an individual's impairment is so severe as to preclude the performance of the kind of work he or she has done in the past, other factors including age, education, past work experience and residual functional capacity must be considered to determine if other work can be performed (20 C.F.R. §§ 404.1520(f) and 416.920(f) (1992)).

*Hogg v. Sullivan*, 987 F.2d 328, 332 (6th Cir. 1992). The claimant has the burden to go forward with the evidence in the first four steps and the Commissioner has the burden in the fifth step. *Moon v. Sullivan*, 923 F.2d 1175, 1181 (6th Cir. 1990).

### B. <u>Review of Cases Involving Substance Abuse</u>

Under the Contract with America Advancement Act of 1996, a person shall not be considered disabled for social security disability benefits purposes if drug addiction or alcoholism would be a contributing factor material to a disability finding. *Bartley v. Barnhart*, 117 Fed.Appx. 993, 998 (6th Cir. Dec. 20, 2004), unreported, citing Pub.L. No. 104-121 § 105(a)(1); *see also* 42 U.S.C. §§ 423(d)(2)(C), 1382c(a)(3)(J); H.R. 104-379, 104th Cong., 1995 WL 717402 (Leg.Hist.) at *20 (Dec. 4, 1995).

The Regulations provide for the following procedure to determine if drug addiction or alcoholism is material to the determination of disability:

How we will determine whether your drug addiction or alcoholism is a contributing factor material to the determination of disability.

a) General. If we find that you are disabled and have medical evidence of your drug addiction or alcoholism, we must determine whether your drug addiction or alcoholism is a contributing factor material to the determination of disability.

(b) Process we will follow when we have medical evidence of your drug addiction or alcoholism.

> (1) The key factor we will examine in determining whether drug addiction or alcoholism is a contributing factor material to the determination of disability is whether we would still find you disabled if you stopped using drugs or alcohol.

> (2) In making this determination, we will evaluate which of your current physical and mental limitations, upon which we based our current disability determination, would remain if you stopped using drugs or alcohol and then determine whether any or all of your remaining limitations would be disabling.

>> (i) If we determine that your remaining limitations would not be disabling, we will find that your drug addiction or alcoholism is a contributing factor material to the determination of disability.

>> (ii) If we determine that your remaining limitations are disabling, you are disabled independent of your drug addiction or alcoholism and we will find that your drug addiction or alcoholism is not a contributing factor material to the determination of disability.

20 C.F.R. §§ 404.1535 and 416.935. In other words, if the ALJ completes the standard five-step process outlined above and determines that a claimant is disabled with substance abuse, the ALJ must then proceed to conduct the second analysis outlined above in order to determine if the claimant would still be disabled without the substance abuse. *Underwood v. Comm'r of Social Sec.*, No. 4:08-CV-2540, 2010 WL 424970 at *6, *10 (N.D.Ohio Jan 22, 2010). The claimant has the burden of proving that substance abuse is not a factor material to the determination of disability. *Estes v. Barnhart*, 275 F.3d 722, 725 (8th Cir.2002); *Brown v. Apfel*, 192 F.3d 492, 498 (5th Cir.1999).

## VI.  **STANDARD OF REVIEW**

Under the Social Security Act, the ALJ weighs the evidence, resolves any conflicts, and makes a determination of disability. This Court's review of such a determination is limited in scope by § 205 of the Act, which states that the "findings of the Commissioner of Social Security as to any fact, if supported by substantial evidence, shall be conclusive." 42 U.S.C. § 405(g). Therefore, this

Court's scope of review is limited to determining whether substantial evidence supports the findings of the Commissioner and whether the Commissioner applied the correct legal standards. *Abbott v. Sullivan*, 905 F.2d 918, 922 (6th Cir. 1990). The Court cannot reverse the decision of an ALJ, even if substantial evidence exists in the record that would have supported an opposite conclusion, so long as substantial evidence supports the ALJ's conclusion. *Walters v. Comm'r of Soc. Sec.,* 127 F.3d 525, 528 (6th Cir.1997). Substantial evidence is more than a scintilla of evidence, but less than a preponderance. *Richardson v. Perales*, 402 U.S. 389, 401 (1971). It is evidence that a reasonable mind would accept as adequate to support the challenged conclusion. *Id.*; *Walters,* 127 F.3d at 532. Substantiality is based upon the record taken as a whole. *Houston v. Sec'y of Health and Human Servs.*, 736 F.2d 365 (6th Cir. 1984).

## VII.  ANALYSIS

### A.  ALJ's Materiality Finding

Plaintiff asserts that the ALJ improperly found that her substance use was material to her disability. ECF Dkt. #16 at 23. She contends that the ALJ erred in his determination because he failed to point to any evidence of increased functioning after her September 2010 sobriety date and relied only upon evidence preceding that date. *Id*. at 23-21.

It is true that the ALJ mainly relied upon the two-year sobriety period that Plaintiff achieved from July 2007 to December of 2009. He noted that during this time, notes from Ms. Proehl indicated that Plaintiff was staying busy, sleeping well and her mood and anxiety were stable. Tr. at 20, citing Tr. at 471. Her progress notes from October 5, 2007 indicate that Plaintiff had a stable mood, was staying busy and sleeping well. *Id*. at 471. Ms. Proehl found that Plaintiff's demeanor, speech, thought process and content, perception, affect, behavior and cognition were all within normal limits*. Id.* Ms. Proehl made similar findings in November and December of 2007, and throughout 2008 and 2009. *Id*. at 473, 475, 477, 481, 491, 493, 531, 543, 545, 547, 551, 555, 559, 561, 563, 568, 662, 664, 671. The ALJ also noted that Plaintiff was able to work cleaning houses from at least July 2008 through December 2009 and told her counselor that when her daughter started all-day kindergarten in 2009, she wanted to return to full-time work. Tr. at 21, citing Tr. at 594. Plaintiff had also reported in April 2009 that she wanted to clean more houses than she already

was, but she did not have a car or driver's license.  Tr. at 21, citing Tr. at 601.  The ALJ additionally noted that during this time, Dr. Martin reported that Plaintiff still had symptoms of depression and anxiety, but was generally doing well and coping with stress, with a stable mood and mild depression.  Tr. at 21, citing Tr. at 541.  In fact, Dr. Martin had indicated that Plaintiff was moderately as opposed to markedly ill in mid to late 2008, and in July of 2009.  *Id.* at 558, 565-567, 574, 700.  The ALJ also noted that Plaintiff's counselor had reported in May of 2008 and June 2009 that Plaintiff was able to focus, was calm and rational, and had a GAF of 65 in May of 2008.  Tr. at 21, citing Tr. at 441-446, 456.

The ALJ also addressed Dr. Martin's March 3, 2010, July 1, 2010, July 14, 2010, July 26, 2010 January 23, 2012 opinions and medical statements, acknowledging that she was Plaintiff's treating psychiatrist and that she had issued such opinions.  Tr. at 21.  However, he properly explained why he attributed less than controlling weight to these opinions, noting that the statements were made during periods when Plaintiff was actively abusing substances.  *Id.*  The ALJ noted that at the time of the March 2010 opinion, Plaintiff was stealing money from her parents and stealing their checks and stealing credit cards from her employer to pay back drug dealers and to buy drugs.  Tr. at 21, citing Tr. at 832.  He cited to Plaintiff's active use of cocaine and heroin at the time of the July 2010 opinions.  Tr. at 21, citing Tr. at 959-960.  The ALJ also noted that Plaintiff had tested positive for barbituates, benzodiazepines and opiates near the time of the January 2012 opinion.  Tr. at 21, citing Tr. at 1329. He cited to Plaintiff's suspected drug-seeking behavior in December of 2011 and January 2012.  Tr. at 21, citing Tr. at 1335, 1418.  The ALJ also concluded that Plaintiff was not always forthcoming with Dr. Martin, which lessened the weight to give to her opinions, citing as an example the fact that Plaintiff's counselor indicated that Plaintiff did not tell Dr. Martin about her return to drug use or that she used stolen money in order to obtain them.  Tr. at 22, citing Tr. at 946-947.  These reasons constitute good reasons for attributing less than controlling weight to Dr. Martin's opinions.

Plaintiff complains that the ALJ did not address the record evidence concerning her mental health during her sobriety after September of 2010, which she asserts supports a finding that her mental health conditions actually deteriorated after she stopped self-medicating with opiates.  ECF

Dkt. #16 at 24-25.  While the ALJ did not spend a great deal of time discussing Plaintiff's post-September 2010 mental health conditions during this time, he provided good reasons for not doing so.  The ALJ found that questions surrounded Plaintiff's sobriety during this period and he cited to sufficient evidence that supported a finding that Plaintiff was not sober since this period.

The Court notes that in her testimony before the ALJ, Plaintiff stated that she had been sober since September of 2010.  Tr. at 53.  She testified that she was in jail from September, 2010 to June 22, 2011 with the exception of two days.  *Id*. at 54.  She also testified that she was not compliant with her medications during that time.  *Id.* at 55-56.  The ALJ noted Plaintiff's testimony that she had been sober since September of 2010, but he found that the evidence did not support her statement.  *Id.* at 23.  The ALJ noted that Plaintiff's father suspected that she was medication-seeking when she was prescribed Vicodin after she sought emergency treatment in November of 2011.  Tr. at 23, citing Tr. at 1209.  He also cited to a toxicology test in December of 2011 from Plaintiff's hospital admission which showed positive results for barbiturates, benzodiazepines and opiates Tr. at 23, citing Tr. at 1329.  The ALJ additionally cited to the same hospital admission and noted that an attending physician suspected that Plaintiff was seeking a secondary gain when she was focused on obtaining pain medications.  *Id*. at 1335.  The ALJ further cited to hospital notes from Plaintiff's January 2012 admission indicating that Plaintiff was dishonest about her history of heroin abuse and she demonstrated medication-seeking behavior.  Tr. at 23, citing Tr. at 1418.  Finally, the ALJ cited to the concerns of Plaintiff's father during that same admission that Plaintiff was manipulating the system.  *Id*.  The ALJ therefore provided sufficient reasons for questioning Plaintiff's sobriety post-September 2010 and thus offered adequate explanation why he did not provide an in-depth analysis of whether Plaintiff's mental health conditions would remain of disabling severity post-September 2010 when that evidence raised questions surrounding Plaintiff's sobriety during that time.

In determining that Plaintiff's mental impairments were not of disabling severity if she stopped substance abuse, the ALJ not only applied the treating physician rule and cited to evidence showing improvement in her conditions during periods of sobriety, the AL J also looked at Plaintiff's daily activities and the opinions of the examining and reviewing agency psychologists.

He noted that Plaintiff cared for herself and her daughter, helped her daughter with her homework, attended support group meetings, was able to clean houses for money, attended her daughter's T-ball practices, attended a weekend support group get-together, performed household chores, and cared for her mother when her mother was ill. Tr. at 21-22.  He cited to the opinions of Dr. Katz and Dr. Hoyle, the agency reviewing psychologists. *Id.* at 22.  Dr. Hoyle provided support for the ALJ's concern as to Plaintiff's sobriety post-September 2010 as she found that while Plaintiff's psychological symptoms did get worse after September 2010 as Plaintiff alleged, treatment notes showed that after her mom had a heart attack, Plaintiff relapsed on drugs and alcohol and was off of her medications while she was using drugs. *Id.* at 851.  She further opined that based upon the evidence, once Plaintiff participated in an outpatient program for her drug abuse and was back on her medications after getting sober, she showed improvement in her mental conditions. *Id.*  The ALJ gave the most weight to the agency psychologists' opinions. *Id.* at 22.

For these reasons, the Court finds that the ALJ complied with the applicable regulations concerning materiality of drug and alcohol abuse, provided sufficient reasons for his findings and substantial evidence supports the ALJ's determination on this issue.

### B.  PAST RELEVANT WORK

Plaintiff also asserts that substantial evidence does not support the ALJ's determination that she could perform her past relevant work as a molding machine operator.  ECF Dkt. #16 at 20-22. She contends that the ALJ's mental RFC for her precluded this past work because part of the ALJ's mental RFC limited her to "simple, routine, repetitive tasks" and the molding machine operator job listed in the Dictionary of Occupational Titles ("DOT") and identified by the VE and relied upon by the ALJ, 556.685.-046, places this job at a semi-skilled skill level and identifies the job as having a Specific Vocational Preparation ("SVP") Level of 3. *Id.* at 21.

At Step Four of the sequential evaluation process, the ALJ will find a claimant not disabled if she is capable of performing her past relevant work as it was actually performed or as it is generally performed in the national economy.   20 C.F.R. § 404.1560(b)(2); 20 C.F.R. § 416.960(b)(2).  The claimant bears the burden at Step Four of showing an inability to perform any past relevant work. *Allen v. Califano*, 613 F.2d 139, 145 (6th Cir. 1980). Social Security Ruling

-28-

("SSR") 82-62 outlines the factors that an ALJ must consider in determining a claimant's ability to perform her past relevant work and provides the following in relevant part:

> The decision as to whether the claimant retains the functional capacity to perform past work which has current relevance has far-reaching implications and must be developed and explained fully in the disability decision. Since this is an important and, in some instances, a controlling issue, every effort must be made to secure evidence that resolves the issue clearly and explicitly as circumstances permit.

>               \*        \*        \*

> A decision that an individual is not disabled, if based on §§404.1520(e) and 416.920(e) of the regulations, must contain adequate rationale and findings dealing with all of the first four steps in the sequential evaluation process.

> In finding that an individual has the capacity to perform a past relevant job, the determination or decision must contain among the findings the following specific findings of fact:

> 1. A finding of fact as to the individual's RFC.

> 2. A finding of fact as to the physical and mental demands of the past job/occupation.

> 3. A finding of fact that the individual's RFC would permit a return to his or her past job or occupation.

SSR 82-62, at \*4. In *Foxwell v. Astrue*, United States Magistrate Judge Vecchiarelli recommended reversal and remand of a social security case in part because the ALJ failed to make all of the findings of fact required by SSR 82-62. Magistrate Judge Vecchiarelli found that while the ALJ made findings of fact as to the claimant's RFC and found that the RFC would allow the claimant to return to her past relevant work, the ALJ failed to make findings of fact as to the physical and mental demands of the past relevant work. No. 3:10CV1002, 2011 WL 4537909, at \*10 (N.D. Ohio July 27, 2011). While other issues also required remand of the case, Judge Vecchiarelli indicated that this Step Four failure alone was a basis for remand. *Id*. at \*11. The District Court adopted the report and recommendation. *See* 2011 WL 4529338 (N.D. Ohio Sept. 28, 2011). This Court relied upon *Foxwell* in *Baker v. Astrue*, No. 1:11CV1096, 2012 WL 4322607, at \*4 (N.D. Ohio, Sept. 20, 2012), unpublished, in remanding a case where the ALJ failed to discuss the requirements of Plaintiff's past relevant work as he actually performed it.

The ALJ in this case could certainly have provided more information as to the demands of Plaintiff's past relevant work as a molding machine operator as she actually performed it. In his

decision, the ALJ did identify the DOT code for the job as Plaintiff asserts and he listed the skill level as semi-skilled with a SVP of 3.  Tr. at 24.  However, as pointed out by Defendant, the ALJ specifically stated that "the claimant would be able to perform it [the molding machine operator job] as *actually performed*."  *Id*.  In an undated disability report for the agency, Plaintiff identified her prior molding machine operator job as that of a "factory worker" running a rubber machine and making rubber parts for trucks.  *Id*. at 247.  She indicated on the form that she did not use technical knowledge or skills in performing this work, she did not supervise others, and she did not write or complete reports.  *Id.*  The ALJ considered Plaintiff's disability report that included this information in his decision.  *Id*. at 20.  The ALJ also indicated in his decision that he had compared his RFC for Plaintiff with the physical and mental demands of the molding machine operator job and he found that Plaintiff could perform the job as actually performed.  *Id*.  at 24.  However, Plaintiff's argument is merely asserting that the DOT classified her past relevant work as semi-skilled with a SVP of 3 and the ALJ's mental RFC precluded such work as he limited her to simple, repetitive tasks, which is essential unskilled work.  ECF Dkt. #16 at 21-22.  However, the ALJ considered this past relevant work as Plaintiff indicated she actually performed it, which according to Plaintiff's disability report was with no technical knowledge or skills, and no writing or completion of reports.  Tr. at 24, 247.  The ALJ therefore relied upon Plaintiff's own statement as to how she actually performed the job and not how it was generally performed.  The Court finds that the ALJ's Step Four findings were adequate to address Plaintiff's assertion and substantial evidence supports his Step Four finding.

## VIII.   CONCLUSION

For the foregoing reasons, the Court AFFIRMS the Commissioner's decision and dismisses Plaintiff's complaint in its entirety with prejudice.


DATE: March 27, 2015                                          ___*/s/George J. Limbert*_____
                                                                          GEORGE J. LIMBERT
                                                                          UNITED STATES MAGISTRATE JUDGE

-30-